**Rudolph Moren, Plaintiff-Appellant, v. Samuel M. Langston Company, Defendant-Appellee.**

Gen. No. 50,940.

First Judicial District.

May 27, 1968.

Rehearing denied July 1, 1968.

Asher, Greenfield, Gubbins & Segall, and Irving D. Levin, of Chicago (George W. Angerstein and Sidney Z. Karasik, of counsel), for appellant.

Baker & McKenzie, of Chicago (Michel A. Coccia, Francis D. Morrissey, and John W. Dondanville, of counsel), for appellee.

**GOLDENHERSH, J.**

Plaintiff appeals from the judgment of the Circuit Court of Cook County entered upon a jury verdict finding in favor of defendant in plaintiff's action for personal injuries.

At the time of his injury plaintiff was employed by Fort Wayne Corrugated Paper Company, hereafter referred to as Fort Wayne, at its plant in Chicago. He was one of a three-man crew operating a printer-slotter machine which had been manufactured by defendant. It had been installed in Fort Wayne's plant approximately 19 months prior to the date of plaintiff's injury.

The printer-slotter machine is described as being 11 feet, 4⅜ inches in length and 13 feet, 2 inches wide. It will print and slot a corrugated paper sheet 42 inches in width and 94 inches long.

Plaintiff's position was that of "first helper" to the operator and his job was to feed the corrugated sheets into the press, put ink in the rollers, check the stops and put dies on the die cylinders.

Walter J. Goettsch, called by plaintiff under section 60 of the Civil Practice Act (c 110, Ill Rev Stats) testified that he was senior vice president of the defendant, and was the salesman who sold the machine to Fort Wayne. He described the printer-slotter as one of defendant's standard machines, entirely designed and engineered by defendant, and sold in the industry for the purpose of printing and slotting cardboard. The machine was shipped to Fort Wayne from defendant's plant in Camden, New Jersey, and the electric components were supplied by Reliance Electrical and Engineering Company under defendant's direction and purchase order. Included in the equipment which defendant furnished Fort Wayne, were stop or safety buttons designed to stop the machine, a safety bar to be mounted across the entrance to the roller area, and a microswitch which

stopped the machine when the safety bar was lifted a fraction of an inch. The machine was equipped with a dynamic braking system which could be activated by various stop buttons and by the microswitch on the safety bar.

At the "feed-end" of the machine, where plaintiff was stationed, there are three stairs up to a catwalk. A passageway which gives access to the printing rollers on the machine forms a right angle with the catwalk. The stairs, the catwalk and the passageway are constructed of steel. The safety bar is installed across the entrance to the passageway, 27 inches above the floor of the catwalk. It is so mounted that when it is raised from the microswitch element, the dynamic braking system is activated. Once activated, the braking system can stop the rollers in a period of time ranging from a fraction of a second to several seconds, depending upon the speed at which the rollers were operating at the time.

Plaintiff testified that in order to prepare the machine for a run of cardboard he was required to lift the safety bar, remove the dies from the bottom roller, and staple on the new dies. That was the only time he was required to enter the passageway area.

On the date of the occurrence plaintiff had gone to work at 3:00 p. m. At about 7:00 p. m., after his lunch break, plaintiff was tightening some keys on the ink fountain. They had just finished an order, and the machine was running so that the ink in the printer could flow back to the fountain. This process took about 10 minutes, and when it was completed, plaintiff was required to clean out an ink trough above the fountain. He walked up the stairs to the entrance to the catwalk where rags were kept and saw a rag lying on the floor of the catwalk, stooped to pick it up, and as he pulled it toward him, part of the rag got caught in the roller and started pulling him toward the roller, he lifted the safety bar with his left hand, and at that time his right

hand was "going into the roll, I let go of the bar and I grabbed with my left hand to try to pull my right hand out." As the result of the injuries suffered, plaintiff's arms were later amputated above the elbows.

Plaintiff's complaint, as amended, charges defective design in that the machine was not equipped with adequate safety devices or guards.

Plaintiff's first claim of error is that the court erred in excluding the testimony of plaintiff's expert on the ground that he was not qualified.

The testimony elicited by interrogation of the witness shows that he is a personnel and safety director employed by a company which manufactures paper cartons and shipping containers. His employer produces corrugated paper shipping containers. He had been with his employer since 1935. He received his degree at the University of Illinois, Class of 1925, as a graduate in mechanical engineering. He is also charged with the safety and accident prevention of another plant operated by his employer. He has been a member of the pulp and paper section of the National Safety Council for 25 years, and a member of the Safety and Industrial Relations Committee of the Folding Paper Box Association of America. The function of the National Safety Council is to promote safety in all of the industries in America. It includes the printing industry.

After graduating from the University of Illinois, he worked for Western Electric for 6 years as a mechanical engineer in their machinery development division.

The National Safety Council publishes newsletters which are published and distributed monthly. He personally prepared some of these newsletters.

His company uses Langston printer-slotters, and he is also familiar with printer-slotter machines manufactured by other companies. He has seen Langston printer-slotter machines in operation at his employer's plant and at other plants in the industry. He had not had anything

137

to do with the design of the Langston printer-slotter machine.

The witness was shown a photograph of the machine, and described it as being similar to the Langston machine in operation in his company's plant at the approximate date of plaintiff's injury.

At this point the court sustained objections to a series of questions, and plaintiff's counsel made an offer of proof.

In the offer of proof, plaintiff's counsel stated that if recalled, the witness would testify that he was personally in charge of printer-slotter presses similar and identical to the one involved in this case, and on which the plaintiff was injured, that he had dealt with this type of machinery for over 25 years by checking them for their safety features, that he had occasion to check not only the plants of his employer, but other plants, and to check similar machines manufactured and used by other companies which operated on the same rotary principle, that he had personally prepared and published articles and bulletins which had disseminated safety information to the manufacturers and users of the machines, and that the defendant was one of the companies to whom this information had been sent suggesting and advising certain safety features be adopted and incorporated in the design and manufacture of the machine; that at the time the machine in question was designed, manufactured and sold to Fort Wayne, there were several types of safety mechanisms which could be used, none of which would interfere with the operation of the machine, one being a wire mesh gate so mounted that entry to the roller passageway could not be gained without unlocking the gate, and also attached to a microswitch comparable to the one used with the safety bar in this case, so that the machine would stop as soon as the gate was unlocked.

He would also testify that there was an electronic eye which would not interfere in the operation of the ma-

chine or in the production of the product which should or could have been attached to the entrance of the areaway so that if any person, either deliberately or accidentally passed the electric eye, the machine would automatically stop. He would also testify that there were wire mesh guards available, which had been manufactured, and which could have been fabricated and placed over the rollers, which would not in any way interfere with the operation of the machine or the production, and the guards would be placed over the bottom rollers, which are the most dangerous.

He would also testify that he had personally designed these wire mesh guards to be affixed over the roller areas so that a person could not come in contact with the rollers, and the witness personally had supervised the installation of approximately 400 to 500 of these wire mesh guards.

He would testify that the machine in question was an imminently and inherently dangerous product, that in the bulletins to which he had previously referred, the manufacturers were notified of the hazard incurred because of the bottom cylinder coming in contact with the one immediately above it, that this was the most hazardous part of the machine, and they were cautioned and warned to supply proper guards so as to protect workmen from such injuries.

His testimony would show that all of these safety features were available at the time that this machine was manufactured, that they were in fact at that time used by many operators of these machines, and were used by the manufacturers as well as by the suppliers.

The witness would also testify that he had made a study of safety in connection with the operation of heavy machinery, and in particular of the kind or character of guards or safety devices that should be affixed to machines, and the standards applicable at the time of the

occurrence provided for one or more of the safety features on machines such as these.

He would also testify that the safety bar which guarded the passageway area was not an adequate safety device, that it was a makeshift affair, and was of itself no protection to any person who accidentally was pulled into the machine, that it was extremely hazardous, and the machine, even after the bar was raised, would run for several cycles extended to 4 to 6 seconds, that all of the items above referred to with reference to safety were on the market at the time of the manufacture of the machine, were easily available, and their cost was negligible compared to the cost of the machine.

He would testify that there were two basic categories for safety devices for this type of machinery, the first being designed to prevent individuals from entering into or near the moving parts, the second being the electronic eye which would stop the machine, and another item was the guard over the in-running cylinders or rollers which would prevent individuals from coming into contact with the moving parts.

██ At the close of the offer of proof, defense counsel objected as follows:

"First, I object because the man was not qualified as an expert in his field and that particular expert field as established by his own admission, he was a personnel man and safety director for one office of Container Corporation, which as I understand it, it is a successor of Fort Wayne, in this case.

"And, I understand that the particular devices this man may have designed for his own plants are not in effect to this date, they have proved to be ineffectual and were removed from the devices and technically from whatever printer-slotter he put them on in his own plants and the standard set by the Langston Company was the only manufacturer of

140

solid printer-slotter presses, which are involved here; that no other manufacturer of solid printer-slotters has come up with any such innovation as counsel has suggested here.

"Counsel has pointed out that this man has designed five such devices for over five hundred such machines and we only made five hundred and fourteen such machines in the entire country up to 1956, at the time of the accident and all of counsel's offer of proof is vague and confusing as to whether or not the National Safety Council does not control or affect the manufacture of the presses or printer-slotters and this literature goes out to the manufacturers of paper cartons in the paper industry and there is no proof that such notices were received by or had any effect upon the particular design on the machine or any better than the particular devices employed here. There is absolutely no evidence here that anything would stop a printer-slotter instantaneously.

"Indeed, I understand the facts to be that machines of this type, if they can be stopped within a fraction of a second up to three, four or five seconds is a miraculous situation; and there is no testimony here whatsoever, except for Counsel's suggestion did they stop instantaneously, and would be a conclusion on the part of this witness.

"And the fact is that the Fort Wayne Company, which is the successor today is still using the particular machine involved today and still used today by the Fort Wayne successor without the devices that counsel suggests. In fact, if they had such knowledge they would have requested such devices and we have no such demands upon the Langston Company by our customers as such.

"In short, your Honor, I suggest that the offer of proof is objectionable for the reasons stated and should be striken (sic) from the record."

141

In Mahlstedt v. Ideal Lighting Co., 271 Ill 154, 110 NE 795, the Supreme Court at page 171, said: "Expert evidence is admissible when the witnesses offered as experts have peculiar knowledge or experience not common to the world, which renders their opinions founded on such knowledge or experience an aid to the court or jury in determining the question at issue. Expert testimony is proper when the subject matter of the inquiry is of such a character that only persons of skill or experience in it are capable of forming a correct judgment as to any fact connected therewith."

As to the qualifications of an expert, in Bonato v. Peabody Coal Co., 248 Ill 422, 94 NE 69, at page 426, the court said: "Whether a witness is competent to give an expert opinion is a question of fact for the trial judge and can only be reviewed when there has been a clear abuse of discretion." In People v. Jennings, 252 Ill 534, 96 NE2d 1077, at page 550, the court said: "The question of the qualification of an expert rests largely in the discretion of the trial court. (Bonato v. Peabody Coal Co., 248 Ill 422, and cases cited.) There can be no arbitrary or fixed test but necessarily only a relative one, dependent somewhat on the subject and the particular witness."

In Miller v. Pillsbury Co., 33 Ill2d 514, 211 NE2d 733, at page 516, the Supreme Court said: "While there has been a reluctance to permit expert testimony on many matters on the basis that it invades the province of the jury, confuses the issues and usurps the function of the jury, the trend is to permit expert testimony in matters which are complicated and outside the knowledge or understanding of the average person, and even as to matters of common knowledge and understanding where difficult of comprehension and explanation. The jury still may accept or reject such testimony."

An excellent guide for determination of the issue of abuse of discretion is found in In re A. Roth Co., Inc., 125

F2d 396, wherein the Court of Appeals for the Seventh Circuit, speaking through Judge Kerner, said at page 398: "Determination of abuse of discretion involves the exercise, by us, of sound judgment upon the facts. If there is controversy as to facts, and if the facts themselves largely define the wisdom of the discretion, review by the appellate court is seldom effective and it should not be. Then appellate court's review does not include trial court's discretion.

"If, however, the facts are not in dispute and it is a question of sound judgment based upon the undisputed facts which are before us as fully as before the trial judge, we are in about as good a position as he to say whether the discretion has been wisely exercised. In short, both trial and appellate courts have the same situation upon which to exercise the same sound judgment."

At the stage of the proceedings at which the trial court made its ruling, there was no factual controversy presented. At that point the testimony of the witness was not disputed, and the court rejected the evidence outlined in the offer of proof. Under the circumstances a court of review, as stated in In re A. Roth, Inc., supra, is in as good a position as the trial court to determine the qualifications of the witness.

█ From our review of the testimony and the offer of proof, we find that the witness clearly possessed knowledge and experience sufficient to qualify him as an expert. The matters set forth in the objection to the offer go to the weight of the witness' testimony, not his qualifications. In excluding his testimony, the trial court abused its discretion.

Defendant contends that assuming arguendo the witness was shown to be qualified, the proffered testimony was inadmissible for the reason that it was "incompetent." Defendant argues further that the offer of proof was too broad, included much that was not admissible and it was not the burden of the trial court to separate

143

the admissible evidence from the inadmissible. Citing Day v. Barber-Colman Co., 10 Ill App2d 494, 135 NE2d 231, and Watts v. Bacon & Van Buskirk Glass Co., 18 Ill2d 226, 163 NE2d 425, it argues that testimony that there were other safety devices available is immaterial, "it is not in itself negligence to supply a certain type of machine though other types of machines might conceivably be safer," and "The issue was not what other types of devices and appliances might have conceivably been safer; evidence to this effect is inadmissible."

An examination of the opinion in Day v. Barber-Colman, supra, shows the evidence there to have been entirely different from that set forth in plaintiff's offer of proof. In reviewing the testimony of Kelton, the expert witness, the court said, at page 501, "There is no evidence that at that time any different general design for a door of this type than the one here involved was in common or accepted use in the industry, or that this design had been found to be unsafe. His testimony as to some possible change in design related to a matter apparently occurring to him some years after this incident." At page 506, the court said: "No different general design for a door of this type than the design here involved was in common use in the industry at that time, and this design had not been found to be unsafe, so far as the record here indicates."

In Watts, the Supreme Court, reviewing the testimony of plaintiffs' expert said at page 229: "Plaintiffs' expert neither examined the glass or the installation involved, nor testified as to the strength or suitability of the plate glass for the use to which it was put." At page 231, the court said: "However, there is no evidence that a plate glass installation was not customary, or that it was inherently dangerous. On the contrary, it appears from the record that such plate glass installation was customary and usual while the use of tempered glass was exception-

144

al. There is no evidence concerning the actual strength of plate glass, or of its unsuitability for the purpose used."

There is no indication in either opinion that evidence was offered as to standards in the industry, use of other materials or devices, or that the defendants knew or should have known of the then existing state of the art in the industries in which the defendants operated.

The cases are clearly distinguishable and do not support defendant's argument.

■ A manufacturer is held to the degree of knowledge and skill of experts, Dunham v. Vaughan & Bushnell Mfg. Co., 86 Ill App2d 315, 229 NE2d 684. This standard imposes upon the manufacturer the duty of an expert to keep abreast and informed of the developments in his field, including safety devices and equipment used in his industry with the type of products he manufactures.

In Darling v. Charleston Community Hospital, 33 Ill2d 326, 211 NE2d 253, the Supreme Court, at page 331, said: "As has been seen, the defendant argues in this court that its duty is to be determined by the care customarily offered by hospitals generally in its community. Strictly speaking, the question is not one of duty, for '. . . in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.' (Prosser on Torts, 3rd ed at 331.) 'By the great weight of modern American authority a custom either to take or to omit a precaution is generally admissible as bearing on what is proper conduct under the circumstances, but is not conclusive.' (2 Harper and James, The Law of Torts, sec 17.3, at 977–78.) Custom is relevant in determining the standard of care because it illustrates what is feasible, it suggests a body of knowledge of which the defendant should be aware,

and it warns of the possibility of far-reaching consequences if a higher standard is required. (Morris, Custom and Negligence, 42 Colum L Rev 1147 (1942); 2 Wigmore, Evidence, 3rd ed secs 459, 461.) But custom should never be conclusive. As Judge Learned Hand said, 'There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. . . . Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.' The T. J. Hooper (2d cir 1932), 60 F2d 737, 740.

"In the present case the regulations, standards, and by-laws which the plaintiff introduced into evidence, performed much the same function as did evidence of custom. This evidence aided the jury in deciding what was feasible and what the defendant knew or should have known. It did not conclusively determine the standard of care and the jury was not instructed that it did."

■ The evidence contained in the offer of proof was admissible to show what was feasible, and what the defendant knew or should have known. Having determined that the proffered evidence was admissible, we reach defendant's contentions with respect to the form and adequacy of the offer of proof, and whether, because it allegedly contained matters not admissible, the court properly rejected it.

■ ■ The purpose of an offer of proof is to indicate to the trial court, opposing counsel, and a reviewing court, the substance of the evidence expected to be offered, Schusler v. Fletcher, 74 Ill App2d 249, 219 NE2d 588,

and the offer was adequate for that purpose. The alleged deficiencies in the offer now argued by defendant were not the reasons for the court's rejection of the evidence. Plaintiff was not required to modify the offer of proof to anticipate the objections now presented, and to do so in the face of its rejection on the ground of the witness' lack of qualification would, indeed, have been a useless act. This, the law does not require. Bartholow v. Davies, 276 Ill 505, 114 NE 1017; Zaremba v. Skurdialis, 395 Ill 437, 70 NE2d 617.

Plaintiff contends that the court erred in the admission of certain photographs offered by defendant for the reason that they are distorted and misleading. We do not further discuss this claim of error for the reason that upon retrial, Hammer v. Slive, 35 Ill App2d 447, 183 NE 2d 49, and Brennan v. Leshyn, 51 Ill App2d 132, 201 NE 2d 167, provide sufficient guidance for the proper exercise of judicial discretion with respect to these exhibits.

We do not reach plaintiff's contentions with respect to alleged errors in the instructions. In large part, the errors were the result of the erroneous rulings on the evidence, and in view of the decisions in the field of manufacturers' liability since the trial of this case, it is unlikely that the same questions will arise upon retrial.

For the reasons set forth, the judgment of the Circuit Court of Cook County is reversed and the cause remanded for a new trial.

Judgment reversed and cause remanded for new trial.

EBERSPACHER and MORAN, JJ., concur.