**WESTINGHOUSE ELECTRIC CORPORATION, Appellant,**

**v.**

**Edgar M. NUTT et al., Appellees.**

**No. 13117.**

District of Columbia Court of Appeals.

Argued Jan. 16, 1979.

Decided Oct. 10, 1979.

Rehearing and Rehearing En Banc Denied Dec. 26, 1979.

Gary W. Brown, Washington, D.C., with whom Ellen A. Patterson, Washington, D.C., was on the brief, for appellant.

Robert J. Stanford, Washington, D.C., for appellees.

Before NEWMAN, Chief Judge, and GALLAGHER and HARRIS, Associate Judges.

GALLAGHER, Associate Judge:

Eleven-year-old Dirickson Nutt fell down an apartment elevator shaft. For injuries sustained, Dirickson and his father, as next friend, sued Westinghouse Electric Corporation (Westinghouse) alleging negligence in design and maintenance of the elevator.[1] The jury found in favor of the Nutts, awarding a verdict of $150,000. On appeal Westinghouse challenges the denial of its post-trial motion for judgment notwithstanding the verdict, asserting (1) the trial court improperly admitted testimony by an unqualified witness regarding elevator design; and (2) the Nutts failed to establish a breach of the applicable standard of care by Westinghouse. Even assuming the qualifications of appellees' expert witness, and crediting his testimony, there was not sufficient evidence of defective design or negligent maintenance to establish a prima facie case.[2] Accordingly, the case must be reversed and judgment entered for Westinghouse.

## I.

During lunchbreak at Henley Elementary School, sixth grader Dirickson Nutt left the school grounds and accompanied a friend to the nearby Park Southern Apartment building. Several classmates joined the twosome en route. The group of boys proceeded to the apartment building and boarded a self-service freight elevator. The elevator had been designed, manufactured and installed by Westinghouse in 1965. Under a service contract, Westinghouse was responsible for maintenance and repair of the elevator.

After boarding the elevator, one of the passengers pushed the fifth floor button, and the elevator ascended. At the fifth floor, the doors opened, but no one alighted. The elevator started to move upward but stopped before reaching the sixth floor; after several seconds the doors opened between floors revealing the fifth floor hallway below.

The parties offered conflicting explanations of the elevator stoppage. According to appellees, a malfunction caused the elevator to halt between floors. Westinghouse contended, however, that one of the passengers forced open the elevator door between floors, bringing the elevator to an immediate stop. All of the passengers testified that one of the boys pulled open the door as the elevator left the fifth floor landing. Dirickson Nutt, who stood in the back of the elevator, testified only that the "elevator rose just a little ways and then stopped." Thus appellees' testimony did not contradict Westinghouse's explanation.

The passengers jumped out of the immobilized elevator, through the door opening, landing in the hall corridor four feet below. In leaving the elevator, Dirickson Nutt slipped into the elevator shaft through an open space underneath the car. Another of the boys had almost fallen into the shaft but was pulled out by a companion. No one saw Dirickson Nutt slip. His last memory was of preparing to jump. He was found later that day at the bottom of the elevator pit. As a result of his fall, he sustained a wound to his left arm, necessitating amputation above the wrist. He also suffered facial injuries requiring plastic surgery.

At trial appellees presented an expert witness, Frederick Foote, a construction safety consultant and Vice-President of the American Society of Safety Engineers. Mr.

---

1. The Nutts also sued Pollinger-Crawford Corporation, the managing agent of the Park Southern Apartment building where the accident occurred, but settled before trial for $5,000. After the jury verdict, the trial court reduced the judgment against Westinghouse by the amount of that settlement although finding Pollinger-Crawford not a joint tort-feasor. In view of our disposition of the case, it is unnecessary to determine whether the trial court's action was erroneous.

2. There is no need to reach appellant's additional arguments regarding proximate cause and jury instructions.

Foote had extensive experience as a safety analyst in various industries, and was offered to testify "with regard to safety principles which must be observed." Since Mr. Foote possessed no expertise in the engineering field, the trial court permitted qualification solely as an expert in the field of safety consulting.

In Mr. Foote's opinion, the elevator as designed was a "dangerous instrumentality," because of the risk created by a stoppage above the landing. He recalled two recent incidents in the area in which exiting passengers had fallen into an elevator shaft, one fatally, through the exposed opening. As a matter of good safety practice, Mr. Foote suggested alternative design features which he considered feasible, although not currently utilized by any elevator manufacturer.

It was Mr. Foote's opinion that the hazard could be eliminated by extending an existing part known as the toe guard to cover the opening. The toe guard, also known as a platform guard or apron, is a smooth metal guard plate extending vertically below the floor surface of the elevator car for 22 inches.[3] The toe guard is currently designed to prevent a passenger's toes from being crushed in the event that the car stops above the hallway and is suddenly lowered by the automatic leveling device. According to Mr. Foote, the guard could be extended approximately five feet, a length sufficient to prevent exiting passengers from falling backwards into the shaft. Westinghouse experts mentioned the hazard caused by the guillotine-like part descending upon an elevator repairman in the pit.[4] Mr. Foote saw no greater danger posed by a six-foot toe guard, since as a matter of safety, a repairman would turn off the power before working below an elevator.

Alternatively, Mr. Foote suggested a variation in the placement of the hallway door latch to make egress from the elevator more difficult. As Westinghouse experts testified, however, the elevator possesses safety features designed to keep passengers in the car between floors, while providing repairmen with access to the shaft. These features include: (1) an inner and a hallway door which open simultaneously only when the elevator stops within the landing zone; (2) a pressure latch on the upper right-hand corner of the corridor door which must be released to exit between floors; (3) an alarm button for the use of trapped passengers; and (4) a pressure of 25–30 pounds keeping the inner car door closed, which must be overridden to manually open the door, and to keep it open.

## II.

Essentially, the issue is whether the Nutts established a prima facie case of negligent design. Westinghouse alleges a failure by the Nutts, as plaintiffs, to prove a departure by Westinghouse from the applicable standard of care. A breach of duty by the defendant is, of course, a prerequisite of liability; negligent conduct, by definition, "falls below the standard established by law for the protection of others against unreasonably great risk of harm." Restatement of Torts § 282 (1965). *See also* Prosser, The Law of Torts §§ 30–31 (4th ed. 1971).

Without question Westinghouse, as manufacturer, was under a duty to design a reasonably safe elevator. This duty did not require Westinghouse "to adopt every possible new device which might possibly have been conceived or invented." *Day v. Barber-Colman Co.*, 10 Ill.App.2d 494, 508, 135 N.E.2d 231, 238 (1956). In a design case, as in other areas of tort law, liability

---

3. The American Standard Safety Code for Elevators, Rule 203.9 (1965), requires the toe guard to extend below the floor surface at least the depth of the leveling zone plus three inches. The leveling zone is the area above or below an elevator landing within which the leveling device is permitted to cause movement of the car toward the landing. Rule 3.35d.

4. There was testimony by Westinghouse experts that a toe guard extension had been considered by the American National Standards Elevator Code Committee, but rejected because of the hazard to repairmen.

is imposed only for the creation of an unreasonable danger. *See generally* 1 Frumer & Friedman, Products Liability § 7 (1979). Thus, Westinghouse's duty was one of reasonableness in designing the elevator "so as to make it not accident-proof, but safe for the use for which it was intended."[5] *Pike v. Frank G. Hough Co.,* 2 Cal.3d 465, 470, 85 Cal.Rptr. 629, 632, 467 P.2d 229, 232 (1970), quoting *Varas v. Barco Manufacturing Co.,* 205 Cal.App.2d 246, 258, 22 Cal.Rptr. 737, 744 (1962).

As this court recently stated, the manufacturer of a chattel will be liable for "injuries to others expected to use the chattel when the injuries are caused by the lack of reasonable care in adopting a safe plan or design." *Turner v. American Motors General Corp.,* D.C.App., 392 A.2d 1005, 1007 (1978) (citations omitted). *See also* Restatement (Second) of Torts § 398 (1965). This duty of care includes the adoption of reasonable safety devices. *Turner, supra* at 1007. What constitutes "reasonable care" will vary with the circumstances, and involves "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of precaution which would be effective to avoid the harm." 2 Harper & James, The Law of Torts § 28.4, at 1542 (1956). *See also* Noel, *Manufacturer's Negligence of Design or Directions for Use of a Product,* 71 Yale L.J. 816, 818 (1962).

Westinghouse points to its compliance with existing industry-wide standards as dispositive of the question of due care. Two professional engineers, experts in elevator design, testified at trial that the elevator complied with all applicable safety codes and regulations. An elevator inspector for the District of Columbia government established conformance with the local elevator code. It is axiomatic, however, that compliance with legislative or industry standards "does not prevent a finding of

negligence where a reasonable man would take additional precautions." Restatement (Second) of Torts, *supra,* § 288c.

In *Turner v. American Motors General Corp., supra,* we rejected the argument that compliance with a statute or regulation insulates the manufacturer from liability for negligent design. There we said, "compliance with a statute or regulation neither establishes due care, nor precludes a finding of negligence." *Id.* at 1007. *See also Burch v. Amsterdam Corp.,* D.C.App., 366 A.2d 1079, 1085 (1976); *Princemont Construction Corp. v. Smith,* 140 U.S.App.D.C. 111, 114, 433 F.2d 1217, 1220 (1970). Thus, the plaintiff in *Turner,* an injured bus passenger, was entitled to introduce evidence that the defendant bus company negligently designed the vehicle, despite conformance with federal safety regulations and contract specifications.

Similarly, industry-wide custom influences, but does not conclusively determine, the applicable standard of care. As Justice Holmes put it, "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not." *Texas & P. R. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903). Evidence of industry custom, however, may be conclusive when a plaintiff fails to introduce *any* evidence that the product was not reasonably safe for its intended use. *Turner v. Manning, Maxwell & Moore, Inc.,* 216 Va. 245, ——, 217 S.E.2d 863, 868 (1975). Thus, the elevator's conformity to industry and legal standards established Westinghouse's due care unless the Nutts proffered contrary evidence that the product, as designed, created an unreasonable danger.

The sole evidence produced by the Nutts to establish a departure from the

---

**5.** "Intended use" is an adaptation of the basic test of reasonable foreseeability framed to fit the products liability context. The standard imposes upon the manufacturer the duty to guard against reasonably foreseeable risks of harm arising in the course of proper use. *See,*

*e. g., Mickle v. Blackmon,* 252 S.C. 202, 166 S.E.2d 173, 187 (1969), *quoting Spruill v. Boyle-Midway, Inc.,* 308 F.2d 79, 83–84 (4th Cir. 1962). *See also Otis Elevator Co. v. Wood,* 436 S.W.2d 324 (Tex.1968).

standard of care was the testimony of Mr. Foote. In effect, Mr. Foote gave his opinion that a longer toe guard or a different latch placement would have prevented the accident. To show lack of due care, expert testimony is admissible regarding the nature and feasibility of safeguards and precautions which could have been taken. *See, e. g., Pike v. Frank G. Hough Co., supra,* 2 Cal.2d at 472, 85 Cal.Rptr. at 633, 467 P.2d at 233. *See generally* Frumer, *supra,* § 12.02[2]. However, evidence of a design alternative, by itself, is not sufficient to impose liability on the manufacturer. *See Weakley v. Fischbach & Moore, Inc.,* 515 F.2d 1260, 1267 (5th Cir. 1975); *Henderson v. Ford Motor Co.,* 519 S.W.2d 87, 93 (Tex. 1974).

> It is one thing to show that the defendant might have designed a safer product; quite another to show that the product he did design was unreasonably dangerous. The defendant is not obliged to design the safest possible product, or one as safe as others make or a safer product than the one he has designed, so long as the design he has adopted is reasonably safe. [*Weakley v. Fishbach & Moore, Inc., supra* at 1267; citations omitted.]

Thus, Mr. Foote's testimony, standing alone, could not establish that Westinghouse created an unreasonable danger or failed to exercise reasonable care in designing the elevator.

■ A finding of unreasonable danger most often turns on the absence of a safety device that was available at the time of manufacture. Adoption of the suggested design alternative by other manufacturers for use in the same or similar equipment would be persuasive evidence. *See, e. g., Otis Elevator Co. v. Wood,* 436 S.W.2d 324 (Tex.1968). Customary use of another safer design is also relevant to establish the standard of care, and that the defendant's design is unreasonably dangerous. Evidence of available safety mechanisms illustrates what is feasible, and suggests a body of

knowledge of which the defendant should be aware. As the court stated in *Moren v. Samuel M. Langston Co.,*[6] 96 Ill.App.2d 133, 237 N.E.2d 759, 765 (1968):

> A manufacturer is held to the degree of knowledge and skill of experts, *Dunham v. Vaughan & Bushnell Mfg. Co.,* 86 Ill. App.2d 315, 229 N.E.2d 684. This standard imposes upon the manufacturer the duty of an expert to keep abreast and informed of the developments in his field, including safety devices and equipment used in his industry with the type of products he manufacturers.

Here, testimony of customary safety features was not introduced. In addition, appellees' evidence failed to establish that an elongated toe guard is known to be feasible, even though not utilized by other manufacturers. This would seem to be the furthest courts have gone in imposing a duty on the manufacturer to keep abreast of recent scientific developments. *See* Noel, *Manufacturer's Negligence of Design, supra* at 852. Mr. Foote admitted on cross-examination that he had no knowledge of the factors involved in design of a toe guard, nor of the feasibility of his suggestions.

■ Appellees contend, however, that the jury did not require expert knowledge in order to find Westinghouse's conduct unreasonable. Relying on *Salem v. United States Lines Co.,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962), appellees argue that the jury could form an intelligent judgment based on the evidence of prior accidents, Westinghouse's knowledge of the danger, and Mr. Foote's suggestions. *Salem, supra,* involved an action under the Jones Act based on the shipowner's duty to provide seamen with a safe place to work. The Court found the jury capable of determining, without expert testimony, whether the shipowner negligently failed to equip the ship with necessary and feasible safety devices. The safety device at issue was a

---

6. In *Moren, supra,* plaintiff charged defective design of a machine which was not equipped with adequate safety devices or guards, and, which consequently crushed both his hands.

The court admitted testimony concerning safety features available at the time of manufacture and utilized by other manufacturers.

handrail on the crow's nest platform which, the injured seamen contended, would have prevented his fall. In comparison, the feasibility of an elevator toe guard requires knowledge of design or engineering concepts. It is a technical matter, not within the jury's experience. The jury needed supporting expert testimony to assess the burden of precaution to avoid harm, there being evidence that the elevator created a known danger.

▬ Against Westinghouse's evidence that the equipment was reasonably safe as designed, the Nutts mustered little contrary evidence. Mr. Foote's safety suggestions were not competent evidence that Westinghouse, the manufacturer, created an unreasonable danger. Thus, appellees failed to prove Westinghouse's deviation from the applicable standard of care in designing the elevator.

▬ "Since the facts, viewed most favorably to [appellees], permit but one reasonable conclusion as to the proper judgment," the trial court erred in submitting the question of negligent design to the jury. *Faniel v. C&P Telephone Co.*, D.C.App., 404 A.2d 147 (1979). Westinghouse's motion for judgment n.o.v. should have been granted.[7]

*Reversed with instructions to enter judgment for Westinghouse Electric Corporation.*

---

7. In their complaint, appellees charged Westinghouse with negligent maintenance of the elevator. However, counsel did not argue this theory in closing arguments, and the jury was instructed solely as to negligent design, without objection.

Even assuming that appellees did not abandon the theory of negligent maintenance, the evidence was insufficient to establish a prima facie case. To prove negligent maintenance, appellees had to show at a minimum (1) the specific cause of the elevator malfunction, and (2) prior knowledge of the condition coupled with failure to act with reasonable care to correct it. *See. e. g., Mallor v. Wolk Properties, Inc.*, 63 Misc.2d 187, 192, 311 N.Y.S.2d 141, 146 (1969). Testimony at trial did establish difficulties with the freight elevator on five occasions during a three-month period preceding the accident. There was no showing, however, that the earlier problems were related to a defect causing the accident. Indeed, inspection after the accident revealed no unsafe condition. Thus, there was no evidence that the accident was due to a mechanical defect in the elevator.