**Calvin L. SLEDD, Appellant,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellee.**

**No. 80–1424.**

District of Columbia Court of Appeals.

Argued Oct. 15, 1981.

Decided Nov. 9, 1981.\*

---

\* The original disposition of this case was by an unpublished Memorandum Opinion and Judgment. Appellee's motion for publication was granted.

David M. LaCivita, Landover, Md., for appellant.

Vincent H. Cohen, Washington, D. C., with whom Jean S. Moore and Kevin I. MacKenzie, Washington, D. C., were on the brief, for appellee.

Before KELLY, KERN and NEBEKER, Associate Judges.

PER CURIAM:

It is alleged in this appeal that the trial court improperly granted appellee's motion for summary judgment because (1) the measurements of the platform-to-train gaps at the Federal Triangle Metro Station taken by one Brian Moriarty raise an issue of material fact as to whether the actual gaps exceeded appellee's design criteria, and (2) the evidence presented by appellant raised an issue of material fact as to whether the distance between the platform and the subway train at the Federal Triangle Metro Station is unreasonably dangerous. We affirm.

I

On June 8, 1978, at approximately 8:30 a. m., appellant Calvin Sledd entered the Federal Triangle Metro Station to service the automatic farecard machines owned by appellee, Washington Metropolitan Area Transit Authority (WMATA). After appellant completed servicing the machines, he was dispatched to another station on the Blue Line in the direction of the Stadium-Armory Metro Station. He was carrying equipment with him which weighed approximately 155 pounds. When a Metro train pulled into the station, appellant placed his equipment inside the train and then board-ed it before all of the passengers had exited. As the remaining passengers left the train, appellant, who was standing sideways in the doorway, placed one foot back on the platform. His foot twisted and slipped into the gap between the platform and the train, causing appellant's leg to fall into the gap up to thigh level. He sustained a number of injuries.

Appellant's counsel, to pursue a possible claim against appellee, hired a professional consultant, Brian Moriarty, a Senior Systems Assurance Engineer at DeLeuw, Cather & Company, who used a twelve inch ruler to take nine measurements of the platform-to-train gaps at the Federal Triangle Metro Station in the direction of the Stadium-Armory Metro Station. Three of these measurements revealed gaps of 4½ inches and 4¾ inches, in excess of appellee's design criteria which specified a gap of 2⅛ inches to 4¼ inches.[1] On March 12, 1980, appellant filed a complaint alleging that appellee was negligent in failing to observe reasonable care in the design and/or acceptance of a "too wide" gap between the Metro train and platform and in failing to correct and warn of the dangerous condition.

In April of 1980, Mr. Moriarty learned that his employer, DeLeuw, Cather & Company, was a consultant for appellee's subway system and advised appellant's counsel that he could not continue their relationship.

On June 4, 1980, appellee filed a motion for summary judgment alleging that there was no genuine dispute of material fact inasmuch as the platform-to-train gap at the Federal Triangle Metro Station was within the established design criteria and was reasonably safe.[2] Appellant opposed the motion on the basis of the affidavit of Mr. Paul Gottfried, an electrical engineer, who stated that appellee's design criteria exceeded those recommended by the Ameri-

---

1. The design criteria specify the recommended distance between the station platforms and the trains in the Metrorail system. This platform-to-train gap is the necessary space needed to permit the trains to pass through each station without striking the platform(s).

2. In support of its motion, appellee submitted gap measurements from seven other representative subway systems. Metrorail's gap was comparable to or less than that of those systems.

can Public Transit Association (APTA) in its 1979 guidelines,[3] that a review of preliminary measurements (those of Mr. Moriarty) indicated that from time to time the gap at the Federal Triangle Metro Station exceeded appellee's maximum allowable gap and that further testing was necessary to determine whether the gaps were in conformance with appellee's design specifications. Appellant then filed a Rule 34 request to enter the Federal Triangle Metro Station to measure the gap. Super.Ct.Civ.R. 34.

At the summary judgment hearing on September 19, 1980, the trial court deferred resolution of appellee's motion to provide appellant an opportunity to make the requested measurements. The court ordered that the measurements be taken while both parties' experts were present. On October 2, 1980, representatives of appellant and appellee met at the Federal Triangle Metro Station to take gap measurements. To ensure the accuracy of the measurements, each train was stopped and not permitted to proceed until each party's expert had obtained his own independent measurement. No measurement taken by either party exceeded the design criteria maximum of 4½ inches.[4]

A second hearing on appellee's motion for summary judgment took place on October 20, 1980. At this hearing, appellant sought to rely on Brian Moriarty's measurements to defeat the motion. The court postponed ruling on the motion until an affidavit of Mr. Moriarty arrived on the next day. Mr. Moriarty's affidavit however did not help appellant; it stated that his preliminary measurements were "imprecise," "unscientific" and "isolated" and that "no reliance" should be placed on them.

On October 21, 1980, the court held a third summary judgment hearing. Appellant's counsel requested an opportunity to take Mr. Moriarty's deposition on the ground that he was surprised and angry at the substance of the affidavit. The court granted the request.

At his deposition, Mr. Moriarty reaffirmed the statements in his affidavit. He confirmed that the statements were his own and that the affidavit was drafted, prepared and executed by him alone. He denied that his employer had forced or ordered him to prepare the affidavit.

On October 28, 1980, a fourth summary judgment hearing was held. The court granted appellee's motion, concluding that there was no evidence genuinely raising the issue that appellee's actual gaps had exceeded the design criteria. The court found that (1) the preliminary measurements taken by Mr. Moriarty were contrary to those taken by appellant's own expert witness, Mr. Gottfried; (2) Mr. Gottfried's measurements were consistent with those gathered by appellee's experts; and (3) Mr. Moriarty's statements in his affidavit, reaffirmed at his deposition, indicated that the measurements he took were "inherently untrustworthy."

The trial court also disposed of appellant's other contention that the gap was unreasonably dangerous, holding that the record established "that at the time of the design and the time of construction [of the Federal Triangle Metro Station], the [appellee] was in conformity with industry standards and the state of the art." Applying the standard set forth in *Westinghouse Electric Corp. v. Nutt*, D.C.App., 407 A.2d 606 (1979), the court concluded that appellant had failed to introduce any evidence that the gap at Federal Triangle was not reasonably safe for its intended use. This appeal followed.

II

Summary judgment may be granted in an action "if the pleadings, depo-

---

**3.** The 1979 APTA guidelines suggested that an opening of up to 3¼ inches could be considered in future subway systems. APTA expressly stated that its guidelines were not intended to be retroactively applied to any existing subway systems. At the time Metrorail was designed (1966–1968), no such guidelines existed.

**4.** None of the measurements taken by appellant's expert, Paul Gottfried, exceeded 3⅞ inches.

sitions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material matter of fact and that the moving party is entitled to judgment as a matter of law." Super.Ct.Civ.R. 56(c); *Nader v. de Toledano*, D.C.App., 408 A.2d 31, 41 (1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *Reichman v. Franklin Simon Corp.*, D.C.App., 392 A.2d 9, 14 (1978). The burden of demonstrating the absence of any factual issue is borne by the moving party. *Nader v. de Toledano, supra* at 42. Since the moving party carries the burden of proving no genuine issue of fact in dispute, the material lodged in support of the motion must be viewed in the light most favorable to the opposing party. *Id.* (citing *International Underwriters, Inc. v. Boyle*, D.C.App., 365 A.2d 779 (1976)). As this court stated in *Nader, supra* at 42, "a motion for summary judgment should be granted if (1) taking all reasonable inferences in the light most favorable to the non-moving party, (2) a reasonable juror acting reasonably *could not* find for the non-moving party, (3) under the appropriate burden of proof." (Emphasis in original).

■ In negligence cases, a properly supported defendant's motion for summary judgment should be granted when the plaintiff's evidence is insufficient as a matter of law to show that the defendant has breached a duty of care. *Graham v. Safeway Stores, Inc.*, D.C.App., 316 A.2d 852, 853 (1974). To be entitled to present his case to the jury, the plaintiff "must first present evidence substantial enough to justify reasonable men in inferring that the defendant was negligent." *Blumenthal v. Cairo Hotel Corp.*, D.C.App., 256 A.2d 400, 402 (1969).

■ In reviewing a trial court's grant of summary judgment, this court's function is to determine whether any material factual issue exists. *Bennett v. Kiggins*, D.C.App., 377 A.2d 57, 59 (1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). Viewing the evidence in the light most favorable to the opposing party, *id.* (citing

*Adickes v. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), we are satisfied that there are no disputed material factual issues with respect to the platform-to-train gap. Accordingly, we conclude that the trial court properly granted appellee's motion.

■ In the instant case, appellant failed to proffer probative evidence sufficient to create an issue of fact to support his contention that appellee was negligent because its platform-to-train gap was "too wide." The evidence in the record demonstrates that the design criteria adopted by appellee were in conformance with the then-prevailing industry standards as evidenced by the design criteria used by other contemporaneously-constructed rapid transit systems. The evidence also establishes that the maximum actual gaps in the Federal Triangle Metro Station were both within appellee's design criteria and comparable to the maximum actual openings in the seven other representative transit systems studied in a survey commissioned by the United States Department of Transportation. Moreover, the actual measurements taken by appellant's own expert witness, Paul Gottfried, were within the design criteria and consistent with measurements gathered by appellee's experts.

In the face of this evidence, appellant seeks to rely on the preliminary measurements of Brian Moriarty to withstand appellee's motion for summary judgment. We agree with the trial court that these measurements, taken under uncontrolled conditions and discredited by Moriarty himself in both a sworn affidavit and a deposition, are "inherently untrustworthy" and do not raise a genuine issue of material fact. Such evidence alone would not justify an inference that appellee was negligent. *See Blumenthal v. Cairo Hotel Corp., supra.*

■ Appellant's second contention is that the evidence of record raises an issue of material fact as to whether the distance between the platform and the subway train is unreasonably dangerous. The trial court, applying our decision in *Westinghouse Elec-*

*tric Corp. v. Nutt, supra,* ruled as a matter of law that the gap at the Federal Triangle Metro Station was reasonably safe for its intended use at both the time it was constructed and at the time of the accident. After reviewing the record, we agree.

 Appellee's duty was one of reasonableness in designing a gap so as to make it not accident-proof but safe for the use for which it was intended. *Id.* at 610. Industrywide custom influences but does not determine the applicable standard of care. *Id.* Evidence of industry custom, however, may be conclusive when a plaintiff fails to introduce any evidence that the product was not reasonably safe for its intended use. *Id.* It is undisputed that appellee's design criteria were in conformity with those of rapid transit systems built at about the same time.[5] Thus, appellee's conformity to industry standards established its due care, unless appellant proffered contrary evidence that the gap, as designed, created an unreasonable danger. *Id.*

Appellant failed to proffer evidence that the gap was unreasonably dangerous. A finding of unreasonable danger most often turns on the absence of a safety device that was available at the time of manufacture. *Id.* at 611. There is no evidence in the record that appellee failed to include available safety devices.[6] Indeed, Metro station platforms contain an unusual safety feature—blinking lights at the edge of the platform which warn that a train is approaching. Additionally, the trial court found probative, as we do, evidence that at the time of the October 28, 1980, summary judgment hearing approximately three million passengers had used the Federal Triangle Metro Station and only two suffered accidents similar to appellant's. We are

persuaded that appellant failed to make a showing that there was a genuine issue as to whether the gap was unreasonably dangerous.

Affirmed.

the relationship of the Metro Center platform to the Federal Triangle platform.

---

5. Appellant relies on the 1979 APTA guidelines to show that the gap was not in conformity with industry standards. Appellant's reliance is misplaced. These guidelines specifically state that they are not intended to have retroactive effect on existing rapid transit systems.

6. Appellant's evidence that rubber strips were used on the platforms at the Metro Center station is irrelevant. Appellant offered no evidence as to either the purpose of these strips or

