Joyce GATLING, Plaintiff,

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Defendant.**

Civ. A. No. 93–2121 (CRR/PJA).

United States District Court, District of Columbia.

Oct. 24, 1994.

Charles Clinton Parsons, Washington, DC, for plaintiff.

Jacqueline Fitzgerald Brown, Washington, DC, for defendant.

## MEMORANDUM OPINION

ATTRIDGE, United States Magistrate Judge.

The parties have consented to proceed before a magistrate judge for all purposes including trial. 28 U.S.C. § 636(c). Presently pending is the defendant Washington Metropolitan Area Transit Authority's ("WMATA" or "Metro") motion for summary judgment.

### Background

On May 20, 1993, at about 4:45 p.m., the plaintiff, Joyce Gatling, was on WMATA's northbound Gallery Place station platform waiting for a train to take her to the Ft. Totten Station. When the train came to a stop, she noticed that the coach car she intended to enter was fully loaded. As Ms. Gatling attempted to enter the coach, her left toes struck the coach body beneath the door threshold and her left leg lodged in the gap between the platform and the body of the coach. She was immediately assisted by several passengers and extracted from this perilous situation. She entered the coach and proceeded to her destination. It was not until later that evening that she realized the nature and extent of her injury. WMATA was not on notice of this claim until the plaintiff filed suit some four months after the incident. The only known witnesses to the accident are Jan Clark, the plaintiff's daughter, and Raymond Lightfoot, a coworker.

### The Suspension System

WMATA's rail coaches are supplied by either Rohr Industries, Inc. or Breda Costruzioni Ferroviarie in accordance with design criteria issued by WMATA. The specifications require the manufacturers to utilize a dual suspension system which allows for vertical movement of the coaches while passengers are entering and exiting the coach.

The primary suspension system consists of mechanical springs located over the axle, similar to the system used on automobiles. The secondary suspension system utilizes leveling valves and bellows (air bags) to control the level of the coach. These bags, located beneath and exterior to the passenger compartment, are parallel to each other and operate in tandem. By increasing or decreasing the air pressure in the bags, the level of the coach is changed to meet the needs of the passenger load in both static and dynamic conditions. The coach threshold height, normally platform level, can move up and down to compensate for passenger loading and unloading. The design standards allow vertical movement of 3 inches; 1½ inches above to 1½ inches below the standard platform height of 40½ inches. Moreover, the design standards permit a ¼ inch tolerance in the construction of the station platform.[1] Therefore, the coach floor within design standards, may reach a dynamic period level of 1¾ inches above the station platform. The coach floor level is prevented from exceeding this maximum permissible vertical height by mechanical stops. The mechanical stops are metallic projections extending from the coach beneath the platform when the car is stopped at a station.

The design features of the rail system also provide for a gap between the outer edge of the station platform and the body of the coach. This gap allows for variation in station design, construction, track wear, track gauge and wheel flange wear so as to prevent a coach from striking the station platform as it passes through a station.

### Plaintiff's Theories

Ms. Gatling's initial complaint sought damages from WMATA for negligence alleging that "a dangerous, defective condition in the design, construction and maintenance of the defendant's metro system caused" her bodily injury.

Following removal to this Court from the Superior Court of the District of Columbia,

---

1. The design standards allow ¼ inch tolerances in platform levels because of their length, 600 feet, and due to slight running rail variances.

WMATA moved to dismiss the design and construction claims on the grounds of governmental immunity. Although the plaintiff formally opposed the motion to dismiss, her opposition contained a caveat in which she stated:

to avoid any confusion on the nature of the claim ... the complaint has been amended to delete the major work 'design' and thereby remove any colorable relationship to a discretionary decision by the Defendant. Rather here, the Defendant adopted standards to assure a substantially horizontal alignment between the track floor and platform, but negligently failed to assure that the safety devices provided on the coaches performed their intended role of horizontal alignment.

(Pl.'s P. & A.Opp.Mot.Dismiss at 7.)

The amended complaint, however, merely alleged that WMATA was on notice of a "dangerous defective condition and negligently failed to remedy this condition and negligently failed to warn the plaintiff of the hazard." (Am.Compl. at 1.) The complaint lacked specificity and contained no mention of the nature of the dangerous defective condition.

On January 25, 1994, the plaintiff filed a Federal Rules of Civil Procedure 26(b)(4) statement containing the opinions expected to be expressed by her engineering expert witness, Paul Gottfried. According to the statement, based upon the testimony of witnesses and following a review of records and materials furnished by WMATA to Mr. Gottfried, Gottfried would express the opinion that for sometime prior to May 20, 1993, WMATA

was aware of a defective condition which had the potential to present the traveling public with a vertical separation between the horizontal plane of the coach threshold and the horizontal plane of the metrorail platform approximately fifteen to twenty times in excess of the allowed tolerance; ... [that] a reasonably prudent mass transit authority would have revised the regular maintenance schedule procedures to more closely monitor its coaches to reduce or minimize the occurrence of these hazardous vertical separations in [an] effort to

conform the coach-platform horizontal plane to required and acceptable tolerances;

That the deviations in vertical separation from required engineering tolerances posed a hazard to foot movement and placement for the travelling public entering and exiting the metrorail cars during operation;

That a reasonable, prudent transit authority with knowledge that vertical separations potentially exceeding required engineering tolerances in horizontal alignments were foreseeable occurrences in the ordinary operation of the metrorail system would have devised and disseminated adequate warnings sufficient to alert the travelling public of the known hazard....

(Pl.'s Rule 26(b)(4) Stat. at 2.)

At his deposition, Mr. Gottfried disavowed this statement and restated his opinion to be, "Metro was aware or had reason to be aware of the potential for substantial vertical displacement between the threshold and the platform." (Gottfried Dep. at 31.) Based upon mathematical calculations, he concluded the maximum vertical limit the door threshold could *possibly* attain above the platform without damage to the mechanical stops was 2⅜ inches. (*Id.* at 20, 23, 24.) This figure was based on mathematical calculations he performed and presupposed a completely deflated air bag together with a completely compressed mechanical spring on the outboard side of the coach coupled with a fully inflated air bag and fully extended mechanical spring on the inboard side of the coach limited only by the mechanical stops. (*Id.* at 35, 59, 63.) The witness contended that WMATA was aware that the vertical rise may create a tripping hazard because of the availability of national statistics indicating that the gap accident rate was greater at WMATA than for the industry at large. (*Id.* at 51, 52.)

Gottfried further opined that the documents he reviewed also mentioned the existence of defective leveling valves which blocked air flow into air bags when it should not have and allowed excessive air flow when it should not have. He said this condition

would be a contributing factor in increasing the vertical separation between the platform and the coach floor. (*Id.* at 75.) However, he acknowledged that he was speaking theoretically and that he had no basis for concluding that such a condition existed so as to cause or contribute to cause any specific accident including the plaintiff's accident of May 23, 1993. (*Id.* at 75.) Moreover, he agreed that any problems encountered with the leveling valve would constitute a design problem. (*Id.* at 75, 76.) Lastly, Mr. Gottfried conceded that although he had been provided copies of the maintenance records for the coach cars traveling through the Gallery Place station during the evening rush hour of May 13, 1993, he never reviewed them and therefore did not know whether or not any of those coaches had ever experienced air bag overinflation or underinflation or leveling valve problems. (*Id.* at 64.)

In her amended pretrial statement, the plaintiff limited her allegation of defect condition to "a *defective* coach suspension system" which "caused the entire train to abruptly rise up approximately 6 inches above the platform while [the] plaintiff attempted to board" thereby creating a dangerous tripping ledge which caused the plaintiff to fall and wedge her left leg between the coach and platform. (Pl.'s Am.Pretrial Stat. at 1–2.) She contends that the "[d]efendant had actual or constructive notice" of this condition because of "numerous prior incidents." (*Id.* at 1–2.)

Her amended pretrial statement also alleged that WMATA failed to exercise reasonable care for its passengers in that: it failed to correct a dangerous defect; failed to properly maintain the coach suspension system; and failed to warn passengers of the hazard. (*Id.* at 2.)

In her opposition to the defendant's motion for summary judgment, the plaintiff advanced yet another theory of liability. She contended that the defendant was negligent in: (1) failing to remove from service a "high car" with a coach floor elevation exceeding 1½ inches above the WMATA standard of 40½ inches between the top of the rail and the coach floor, (Pl.'s P. & A.Opp.Mot.Summ.J. at 12); and (2) failure of its train operator to

remove the train from service in response to a "rough ride signal" created by a "high car" (*Id.* at 8). She alleged that the primary cause of this "high car" condition was a defective leveling valve and that WMATA knew about this problem since 1983. (*Id.* at 8.) Because of this condition, she asserts gap accidents exceeding the national average by two to three times. (*Id.* at 8.)

To bolster this "high car" theory, the plaintiff submitted an affidavit from her daughter, some five months after the defendant's motion for summary judgment was at issue, stating that as the northbound train arrived at the Gallery Place Station she observed that the thresholds of the passenger doors of the coach they were about to board were elevated several inches above the platform.

### Defendant's Theories

WMATA is a regional transportation instrumentality created by an interstate compact between the District of Columbia, the Commonwealth of Virginia and the State of Maryland with the approval of the Congress of the United States. The interstate compact allowed WMATA to plan, develop, finance and operate a balanced regional transportation system. The compact, in pertinent part, grants WMATA immunity for torts occurring in the performance of a governmental functions. WMATA argues that design decisions concerning the width of the gap between a coach and the platform as well as the vertical height of the coach door threshold above the platform are governmental functions for which it is immune.

WMATA further argues that since the plaintiff's expert witness disavowed the opinions set out in the 26(b)(4) statement; admitted that WMATA had breached no duty of care; and merely opined he would have advised WMATA to investigate why the gap injury incidents exceeded the average for other rail systems, no genuine issue of material fact exists as to the cause of the elevated coach.

It also argues that the maximum vertical difference between the coach door threshold and the platform, mathematically calculated by Gottfried, did not constitute an unreason-

ably dangerous condition; that the "worst care" scenario hypothesized by Gottfried was within the design criteria; and that the testimony of the plaintiff and her two witnesses regarding the height of the coach door threshold above the platform was inaccurate because it was physically impossible to attain and is, therefore, entitled to no weight. Accordingly, summary judgment in its favor should be granted.

### Analysis

■ The entry of summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. The moving party has the burden of showing there is no genuine issue of material fact, and once the movant has sustained this burden, the opposing party must introduce specific evidence creating a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue is not established unless the evidence, viewed in a light most favorable to the nonmoving party, would allow a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by substantive law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Rule 56 requires the nonmoving party go beyond the pleadings and by affidavit, deposition, interrogatory answers and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

Recognizing that WMATA is not liable for governmental functions it performs and that the design of the metrorail system is a governmental function, *Simpson v. WMATA*, 688 F.Supp. 765 (D.D.C.1988), the plaintiff creatively attempts to construct a theory of liability on the grounds that WMATA's actions with respect to the vertical and horizontal gaps between the coach and platform were maintenance activities and therefore ministerial functions for which it is not immune.

Thus, in her amended complaint, the plaintiff alleges that WMATA was on notice of a potentially dangerous defective condition and negligently failed to remedy it or warn the plaintiff of the existence of the hazard. In support of that theory she relies primarily on the testimony of her expert witness, Paul Gottfried, who alleged that the gap accidents experienced by Metro exceeded the national average by two or three times and that these gaps were due to defective equipment. Therefore, Gottfried concludes, the reasonable transit system authority should have taken corrective action in the form of design change, a procedure change and/or a warning to passengers.

■ The defective equipment referred to by Gottfried is the leveling valve which automatically adjusts the inflation and deflation of the air bag suspension system. The plaintiff points to a WMATA engineering memo, prepared by Joseph Krempasky, as evidence that the leveling valves were defective and that WMATA knew of this condition since 1983. The memo details "eleven different unsuccessful efforts [by WMATA], since 1983, to overcome the erratic control valves penchant for over-inflating the air bags." (Pl.'s P. & A.Opp.Mot.Summ.J. at 6.) However, that memo, identified as Krempasky # 1 attached to the plaintiff's opposition, goes on to say "that the majority of the problems [noted on the list] can be classified as VALVE PIN problems; or O–RING problems" and that when a problem did occur a "valve is stuck and the collapsible link is jammed" or the "valve stem pin is again stressed to the point of failure." Continuing, the report states that "[t]his problem can only be overcome by the installation of a self lubricating o-ring. This engineer is not aware of any o-ring which could be used in this application." It concludes with the observation that "[t]his design leaves little margin for any major modification."

■ A fair reading of the full report reveals that if a suspended leveling valve problem did arise in a given coach car, an examination of that coach's air bag leveling valves would clearly show evidence of the nature and extent of the failure. However, the evidence in this case fails to disclose any defects or problems with the leveling valves or any other component of the suspension system or

mechanical stops on any of the 130 coaches which passed through the Gallery Place station during rush hour on May 20, 1993. (Mot.Summ.J., Krempasky Aff. at ¶ 14.) Gottfried was provided with copies of the maintenance and reliability service reports for all 130 coaches and failed to challenge their negative finding. (Gottfried Dep. at 63–64.) Thus, there is no evidence to support Gottfried's opinion that this accident was due to a defective leveling valve. Moreover, according to the WMATA memo, any problem encountered with the leveling valve related to its design. This statement is not disputed by the plaintiff. Design decisions constitute discretionary decision within the parameters of WMATA's governmental function for which it is immune from suit. *Dant v. District of Columbia,* 829 F.2d 69, 74–75 (D.C.Cir.1987); *Simpson v. WMATA,* 688 F.Supp. 765, 766 (D.D.C.1988); *Nathan v. WMATA,* 653 F.Supp. 247, 248 (D.D.C.1986). Therefore, there is no evidence that the high elevation of the coach the plaintiff attempted to board on May 20, 1993, was caused by a malfunctioning leveling valve. And, to the extent WMATA did encounter leveling valve problems from time to time, there is no evidence that they were attributable to maintenance failures. Instead the witnesses, including Gottfried, attribute the problem to design deficiencies.

■ Next, the plaintiff contends that since WMATA's gap accident rate exceeded the average for the industry, therefore, it was put on notice of a problem. Mr. Gottfried testified that given the statistics, WMATA should have recognized it had a problem because "the passenger rate [of gap accidents] is higher for WMATA than for the industry at large." (Gottfried Dep. at 51.) However, a review of the record relied upon by Gottfried does not support his view that WMATA's gap accident rate exceeded the national average so as to put it on notice of the existence of an unreasonably unsafe condition. The statistics relied upon by him as support for his opinion are found in a compilation he prepared showing that in 1983 all U.S. heavy rail transit systems had 279 boarding/alighting injuries for 1,574,000,000

passengers or an injury rate of 0.18 per million passengers. During the time period 1990–91, 1,233 industry-wide enter/exit injuries were reported for 4,375,000,000 passengers for an injury rate of 0.28 per million passengers. Whereas, during the period 1986–93, WMATA's records reflect 417 gap injuries for 1,109,000,000 passengers or an injury rate of 0.38 per million passengers. (Def.'s Mot.Summ.J., Ex. 19.)

This difference is so negligible so as to be meaningless. For example, if a comparison of the period 1990–91, the industry had 1233 reported enter/exit injuries for 4,375,000,000 passengers. *Id.* During the same period, WMATA reported 93 gap injuries for 292,110,000 passengers. (Def.'s Mot.Summ.J., Ex. 4 at ¶¶ 5–6.) Thus, during that two year period, WMATA had substantially the same injury rate per passenger as that compiled by Gottfried during a comparable period for the industry as a whole.[2] During this period of time, the same leveling valve system was in use as was in use when the plaintiff fell in 1993. It is clear, therefore, that there is no evidence the leveling valve problems referred to in the WMATA memo raised the WMATA gap accident statistics above the national average so as to put it on notice of the existence of an unreasonably dangerous condition and Gottfried's conclusions to that effect are without evidentiary support.

In *Sledd v. WMATA,* 439 A.2d 464, 469 (App.D.C.1981) the District of Columbia Court of Appeals concluded as a matter of law, that 2 gap accidents among approximately 3,000,000 passengers was not evidence that the platform-to-coach gap was unreasonably dangerous. That frequency translates into a gap accident rate of 0.67 per million passengers; somewhat higher than the 0.38 per million passengers the plaintiff's expert contends should have put WMATA on notice of a problem. If the greater accident rate found by the *Sledd* court was not evidencing an unreasonably dangerous condition, then, *a fortiori,* the lesser rate certainly cannot be said to evidence an unreasonably dangerous condition. In the absence of an unreasonably dangerous condition, WMATA had no duty to warn, *Brooks v. WMATA,* 861

---

**2.** Compare 0.00000028 for the industry versus 0.00000032 for WMATA.

F.2d 1282, 1283 (D.C.Cir.1988); *Jones v. WMATA*, 742 F.Supp. 24, 26 (D.D.C.1990).

■ Mr. Gottfried also hypothesized that a vertical rise of 2⅝ inches above the normal level coach threshold-platform position was *possible* and that this figure exceeded the 1½ inch maximum vertical rise permissible under WMATA's own standards. Although this 2⅝ inch rise is mathematically possible,[3] there is no evidence to support this hypothesis. In order for an air bag to be fully deflated, either the bag would have to have been ruptured or the leveling valve supplying that bag would have to have been defective, and there is no evidence of either having taken place. The maintenance and service records for all the coaches possibly involved in the plaintiff's accident fail to disclose any defects that would support Gottfried's hypothesis of a totally deflated outboard suspension system concurrent with a maximally inflated inboard suspension system.

On page 8 of her opposition, the plaintiff resorts to yet another theory of liability. She argues that WMATA was also negligent in failing to remove from service a "high car" and that the train operator failed to respond to the "rough ride signal" produced by a "high car." As evidentiary support for this theory, five months after the motion for summary judgment was fully briefed and under consideration by the Court, the plaintiff submitted an affidavit of her daughter, Jan Clark, which stated that as the train was coming to a stop at the Gallery Place station, she observed that the door thresholds of the coach her mother and she were about to board were elevated several inches above the platform.

■ Since the plaintiff never pleaded negligence on the part of the train operator, that claim is not properly before the Court. Nonetheless, if it were properly before the Court, it too must fail for lack of evidentiary support. The only evidence to support that theory is the affidavit by Jan Clark. However, there is no evidence that the condition she allegedly observed prior to the train coming to a stop existed long enough for the train operator to have experienced the rough ride feeling of a high car. A train operator cannot be held accountable for a condition about which he had no reasonable notice and no time to respond.

■ Lastly, the plaintiff claims that her testimony and that of her daughter and co-worker that the door threshold of the coach was six and eight inches above the platform at the time she attempted to enter the coach creates issues of fact barring summary judgment.

Each of these witnesses readily admitted that the vertical rise was merely an estimate on his or her part since no actual measurements were taken at the time. On the other hand, the fully corroborated and uncontradicted evidence clearly establishes that mechanical stops preclude the coach door threshold from rising more than 1½ inches above the platform. The maintenance and service records of all 130 coaches traveling through the Gallery Place station during the rush hour period on May 20, 1993, failed to disclose any damage or defect in these mechanical retrains. Thus, it is physically impossible for the door threshold of a coach to rise to the level of six inches or more inches above the platform. Even the plaintiff's expert testified that the maximum rise mathematically possible given the worst possible scenario of a simultaneous fully deflated air bag and compressed mechanical spring versus a fully inflated air bag and fully extended mechanical spring would only create a door threshold vertical elevation of 2⅝ inches above the platform level.

"Judges may, under certain circumstances, lawfully put aside testimony that is so undermined as to be incredible." *Johnson v. WMATA*, 883 F.2d 125, 128 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610. When a claim is supported solely by the testimony of interested witnesses and it has clearly been demonstrated that the testimony of the interested witness

---

**3.** The mathematical conclusion may be achieved if the primary suspension system is fully compressed and the air bag on the same outboard side of the coach is fully deflated, while at the same time, the primary suspension system on the inboard side of the coach is fully extended during the time the air bag on the same inboard side of the coach is fully inflated.

is physically impossible, courts may lawfully remove a purported factual issue from jury consideration. *Id.* This is such a case. The estimates of the plaintiff, her daughter and coworker are so at odds with the objective physical evidence, and the testimony of disinterested witnesses, including the plaintiff's own expert witness regarding the capabilities of the suspension system of WMATA coaches in service at the time, that a reasonable juror could only conclude that the elevation of the coach above the platform that the plaintiff and her witness contend took place, was physically impossible and, therefore this testimony must be disregarded. See generally, *Ralston Purina Co. v. Hobson,* 554 F.2d 725 (5th Cir.1977); *Law v. Virginia Stage Lines,* 444 F.2d 990 (D.C.Cir.1971); *Southern Pac. Co. v. Matthews,* 335 F.2d 924 (5th Cir.1964); *Washington, Marlboro & Annapolis Motor Lines v. Maske,* 190 F.2d 621 (D.C.Cir.1951).

### *Conclusion*

For the foregoing reasons, the Court finds that no genuine issues of material fact exist with respect to the plaintiff's claim of negligence and that WMATA is entitled to judgment as a matter of law.

An appropriate order accompanies this memorandum.

### *ORDER*

Upon consideration of the motion of the defendant Washington Metropolitan Area Transit Authority for summary judgment, the opposition, reply and supplemental pleadings, the entire record and for the reasons stated in the attached memorandum opinion, it is this 24th day of October 1994:

ORDERED that the motion is granted.

FURTHER ORDERED that the complaint is dismissed with prejudice.